### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**LYNN SHIELDS**                                                   **CIVIL ACTION**

**VERSUS**                                                                  **NO. 15-3243**

**BOYS TOWN LOUISIANA, INC., et al.**                **SECTION: "G"(2)**

### ORDER

In this litigation, Plaintiff Lynn Shields ("Shields") alleges that Defendants Boys Town Louisiana, Inc. ("Boys Town") and Father Flanagan's Boys Home (collectively "Defendants") discriminated against her on the basis of her race and retaliated against her for complaining about discrimination and for taking protected leave under the Family Medical Leave Act ("FMLA").[1] Pending before the Court is Defendants' "Motion for Summary Judgment."[2] Having reviewed the motions, the memoranda in support, the memoranda in opposition, the record, and the applicable law, the Court will grant the motion in part and deny the motion in part.

### I. Background

#### A.    *Factual Background*

Shields, a Caucasian woman, alleges that she began working as a Director of Development for Defendants on August 16, 2008 and reported to Defendants' Executive Director for Louisiana, Dr. Dennis Dillon ("Dillon").[3] Shields alleges that she was subjected to discrimination based upon

---

[1] Rec. Doc. 1 at 1.

[2] Rec. Doc. 63.

[3] Rec. Doc. 1 at 1.

1

her race and retaliated against for taking FMLA-protected leave.[4] Shields also alleges that while she was using FMLA leave in 2014, Dillon informed her that Defendants were not happy with her client and fundraising numbers and were closely monitoring her performance.[5] Shields alleges that on October 31, 2014, she was informed that she was being suspended for making racially insensitive remarks and that there would be an investigation.[6] She alleges that despite requesting a copy of her personnel file on or around October 30, 2014, she was never provided with a copy and she was terminated without reason or justification in November 2014.[7]

**B.    *Procedural Background***

Shields filed a complaint against Defendants on August 4, 2015.[8] Defendants filed the instant motion on May 10, 2016.[9] On May 24, 2016, Shields filed an opposition.[10] With leave of Court, Defendants filed a reply on June 3, 2016.[11] Plaintiff filed a sur-reply with leave of Court on June 6, 2016.[12]

---

[4] *Id.* at 1–2.

[5] *Id.* at 4.

[6] *Id.* at 5.

[7] *Id.*

[8] Rec. Doc. 1.

[9] Rec. Doc. 63.

[10] Rec. Doc. 74.

[11] Rec. Doc. 83.

[12] Rec. Doc. 85.

## II. Parties' Arguments

### A.   *Defendants' Arguments in Support of Summary Judgment*

 Defendants contend that they are entitled to summary judgment on Shields' claims of race discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act and the Louisiana Employment Discrimination Act, as well as her claims of interference with Family Medical Leave Act ("FMLA") rights and retaliation for use of FMLA leave, on the grounds that there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law.[13]

First, Defendants contend that any federal claims arising out of allegations taking place prior to May 8, 2014, or 300 days before Shields filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), are time-barred pursuant to Title VII.[14] Defendants also assert that state claims of race discrimination based upon conduct prior to February 3, 2014 are prescribed under the Louisiana Employment Discrimination Law, Louisiana Revised Statute 23:303(D).[15]

Second, Defendants assert that Shields is "unable to establish a reverse race discrimination claim."[16] Defendants contend that under the *McDonnell Douglas*[17] framework, Shields must first establish a prima facie case of discrimination.[18] Defendants argue that Shields cannot do so as she

---

[13] Rec. Doc. 63 at 1.

[14] Rec. Doc. 63-1 at 18.

[15] *Id.* at 19.

[16] *Id.* at 20.

[17] *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973).

[18] Rec. Doc. 63-1 at 20.

must show that: (1) she is a member of a protected group; (2) she was qualified for the position held; (3) she was discharged from the position; and (4) she was replaced by someone outside of the protected group or others similarly situated were treated more favorably.[19] Defendants acknowledge that Shields meets the first prong as she is Caucasian and the third prong as she was terminated from her employment.[20] However, Defendants assert that Shields cannot show that she was qualified for the position or that she was replaced by someone outside of the protected group or that others similarly situated were treated more favorably.[21]

Defendants assert that even if Shields could establish a prima facie case of race discrimination, Defendants are entitled to summary judgment because they had legitimate, non-discriminatory reasons for terminating her.[22] Defendants assert that Shields was terminated for making racially insensitive remarks to another employee, Keli Nees ("Nees"), for her long-term poor performance, and the lack of support of Executive Director Dillon.[23] Defendants argue that there is no evidence that the reasons given were a pretext for discrimination.[24] Defendants contend that Shields must rebut each of Defendants' nondiscriminatory reasons in order to survive summary judgment.[25] Defendants argue that the decision to terminate Shields was made after a good-faith investigation of the allegations made by Nees and after Acting General Counsel had

---

[19] *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).

[20] *Id.* at 21.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.* at 23.

[25] *Id.* (citing *Jackson v. Watkins*, 619 F.3d 463, 467 (5th Cir. 2010)).

interviewed Shields and the witnesses and concluded that the allegations were credible.[26] Furthermore, Defendants contend that even if they were incorrect in concluding that Shields made racially offensive remarks, Shields still cannot prove pretext because even an employer's incorrect conclusion of a policy violation is a legitimate non-discriminatory reason for an adverse employment decision.[27] Defendants assert that because Shields cannot present competent summary judgment evidence to show that race was a motivating factor in the decision to terminate her, she cannot raise a genuine issue of material fact.[28]

Third, Defendants contend that they are entitled to summary judgment on Shields' harassment and racially hostile work environment claim.[29] Defendants assert that Shields must show that: (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prohibitive action.[30] Defendants argue that none of the behavior that Shields complains of had racial connotations or affected the terms and conditions of her employment, and the individuals who made the decision to terminate Shields were unaware of any of Shields' allegations.[31]

---

[26] *Id.*

[27] *Id.* at 24 (citing *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995)).

[28] *Id.* at 26.

[29] *Id.*

[30] *Id.* (citing *Benoit v. MedVance Inst. of Baton Rouge*, No. 3:09-0223, 2011 U.S. Dist. LEXIS 24821 (W.D. La. Mar. 10, 2011)).

[31] *Id.* at 27.

Fourth, Defendants contend that Shields cannot establish a prima facie case of race retaliation, which, they assert, requires a plaintiff to show that: (1) she participated in statutorily protected activity as described in Title VII; (2) an adverse employment action occurred; and (3) a causal connection exists between the protected activity and the adverse action.[32] Defendants assert that Shields did not engage in any protected activity and cannot show a causal link between her termination and any alleged protected activity.[33]

Fifth, Defendants assert that Shields cannot establish that Defendants interfered with her FMLA rights.[34] Defendants aver that in order to prevail on a claim for FMLA interference, a plaintiff must prove that: (1) she was an eligible employee; (2) the employer "interfered" with her rights under the FMLA; and (3) she was prejudiced by the interference.[35] Defendants contend that there was no interference with Shields' FMLA rights because she received all of the FMLA leave she requested and she returned to her position as Director of Development with the ability to work at home.[36]

Sixth, Defendants assert that Shields cannot establish a cause of action for FMLA retaliation.[37] Defendants contend that in order to establish a prima facie case of retaliation, Shields must show that she: (1) engaged in protected activity under the FMLA; (2) suffered an adverse

---

[32] *Id.* at 28 (citing *Mota v. Univ. of Tex., Houston Health Science Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001)).

[33] *Id.*

[34] *Id.*

[35] *Id.* at 29 (citing *Knox v. City of Monroe*, No. 07-606, 2009 U.S. Dis. LEXIS 104, at *13–14 (W.D> La. Jan. 8, 2009)).

[36] *Id.* (citing Rec. Doc. 63-2 at 66, 93–94).

[37] *Id.*

employment action; and (3) the adverse action was taken because she took FMLA leave or another employee who didn't take FMLA leave was treated more favorably.[38] Defendants assert that there is no evidence that Shields was treated less favorably than similarly situated employees who did not take FMLA leave.[39] Furthermore, Defendants contend that even if Shields could establish a prima facie case, Defendants have articulated legitimate, nondiscriminatory reasons for her termination, including Shields' racially insensitive remarks to Nees, Shields' long-term poor performance, and her lack of support of Executive Director Dillon.[40]

**B.     *Plaintiff's Arguments in Opposition to the Motion for Summary Judgment***

In opposition, Shields asserts that she has established a prima facie case of race discrimination and retaliation.[41] Shields states that she does not assert a separate and distinct claim for harassment relating to Dillon's mistreatment.[42] Shields contends that she satisfies the second element of a prima facie case of race discrimination, that she was qualified for her position, because she held her position for more than six years and her performance evaluations for the three years preceding her termination demonstrate that she was qualified.[43] Shields further argues that she was replaced by someone outside of the protected class and all of other Directors of Development that were supervised by Dillon were African-American.[44]

---

[38] *Id.* (citing *Lushute v. Louisiana*, 479 F. App'x 553, 554 (5th Cir. 2012)).

[39] *Id.* at 31.

[40] *Id.* at 32.

[41] Rec. Doc. 74 at 2.

[42] *Id.* at 2 n.1.

[43] *Id.* at 3.

[44] *Id.* at 4.

Shields also argues that Defendants' proffered reasons for her termination are "false, unworthy of credence, and pretextual."[45] Shields contends that her sworn testimony directly contradicts Defendants' contention that the decision to terminate was made only after Victor LaPuma ("LaPuma") completed his investigation.[46] Shields asserts that she overhead Dillon state on October 30, 2014, that they had already picked a date for her termination.[47] Shields also argues that the declaration of Director of Human Resources, Traci McAuliffe ("McAuliffe") does not support Defendants' assertion that the decision to terminate Shields was made in good faith after a full investigation.[48]

Turning to Defendants' assertion that they terminated Shields for poor performance, Shields asserts that the evidence establishes that Shields' termination had nothing to do with her performance.[49] Shields points to the testimony of Dillon who asserted that, at most, the alleged performance deficiencies would have resulted in a 30-day performance improvement plan in the absence of Nees' false allegations.[50] Shields also asserts that her performance evaluations directly contradict Defendants' assertions that her performance was "terrible" and warranted termination.[51] Shields also avers that Defendants' contention that Shields was terminated due to a lack of support

---

[45] *Id.*

[46] *Id.* at 5.

[47] *Id.* at 6.

[48] *Id.* at 7.

[49] *Id.* at 7–8.

[50] *Id.* at 8.

[51] *Id.*

of Executive Director Dillon is contradicted by the record as Dillon denied having any involvement in the decision to terminate Shields.[52]

Shields contends that although she is not required to submit any further evidence of discriminatory animus, she asserts that: (1) she was only one of two or three Caucasian employees out of 40-50 total employees at Defendants' Louisiana location; (2) Dillon made derogatory comments regarding the ability of Caucasian individuals to understand Defendants' clientele; and (3) one of Defendants' board members believed that Dillon cultivated an "us versus them" mentality between Caucasians and African-Americans.[53] Shields also asserts that even if Dillon did not play a significant role in Shields' termination, Defendants can be held liable for Dillon's discriminatory and retaliatory conduct under a "cat's paw" theory pursuant to the Supreme Court case *Staub v. Proctor Hospital*.[54]

Shields also contends that she has established a prima facie case for FMLA retaliation and FMLA interference.[55] Shields contends that even though she was out for more than 37 days in 2014, Defendants did not adjust her metrics and while she was out on FMLA-protected leave in 2014, LaPuma recommended that she receive a written warning for performance reasons.[56] Shields asserts that she told Dillon that her FMLA leave was interfering with her ability to perform all of her job responsibilities and that Dillon stated that Shields would be required to meet the metrics

---

[52] *Id.* at 10.

[53] *Id.* at 11–12.

[54] *Id.* at 14 (citing 562 U.S. 411 (2011)).

[55] *Id.* at 15.

[56] *Id.* at 16 (citing Rec. Doc. 74-7 at 21–25; Rec. Doc. 74-9 at 20–21).

"irrespective of any excuses."[57] Shields also contends that a draft performance improvement plan, that was never given to Shields, stated that Shields needed to be working day and night to catch up for visits that didn't happen earlier in the year.[58] Shields asserts that given this evidence, there is at least a genuine issue of material fact regarding whether she was treated less favorably, or even terminated, for exercising her right to FMLA-protected leave and therefore summary judgment is inappropriate.[59] Finally, Shields contends that the *McDonnell Douglas* burden-shifting scheme is unworkable and should be overturned.[60]

## C.   *Defendants' Arguments in Further Support of Summary Judgment*

In reply, Defendants reassert their contention that Shields cannot establish a prima facie case of race discrimination because she was not qualified for her position, pointing to the Vice President of Development's comment that Shields' numbers were "terrible" and the assertion of Associate Vice President of Development, Lisa Hukill ("Hukill"), that she had more than ten conversations with Shields about her insufficient numbers on the metrics. [61] Defendants contend that even if the Court believes that Shields has met her burden of establishing a prima facie case, she cannot prove that the proffered legitimate reasons for termination were false and actually a pretext for discrimination.[62] Defendants contend that Shields did not deny that she made racially

---

[57] *Id.* at 17 (citing Rec. Doc. 74-9 at 27–28).

[58] *Id.* (citing Rec. Doc. 74-2 at 11–12).

[59] *Id.*

[60] *Id.*

[61] Rec. Doc. 83 at 2 (citing *Elliott v. Grp. Med. & Surgical Serv.*, 714 F.2d 556, 567 (5th Cir. 1983)).

[62] *Id.* at 3.

insensitive remarks, had missed the metrics for many years in a row, or that LaPuma investigated the allegations by Nees.[63]

Defendants contend that Shields' assertion that she overheard a conversation during which Dillon allegedly decided to terminate Shields is inadmissible hearsay which cannot be used to defeat summary judgment.[64] Defendants also assert that although Shields alleges that Dillon was part of the decision to terminate Shields, there is no evidence that he had any racial animus toward Shields or Caucasians in general and Dillon actually protected Shields from discipline when other individuals supported termination or disciplinary action much earlier.[65] Furthermore, Defendants contend that if Dillon was the person who made the decision to terminate Shields, the inference of discrimination would be weakened because it is undisputed that he hired her and there is a presumption that discrimination is not the motive behind a discharge when a plaintiff is discharged by the same person who hired them.[66]

Next, Defendants contend that Shields has not cited a single rule or binding precedent to support her argument that Defendants cannot rely upon the outcome of LaPuma's investigation because it was not produced to Shields.[67] Defendants assert that there is no evidence to support Shields' allegation that the investigation was a sham to cover up discrimination.[68] Defendants also contend that even if the results of the investigation were not admissible, they would prevail because

---

[63] *Id.*

[64] *Id.* at 4.

[65] *Id.* at 5 (citing Rec. Doc. 83-4 at 2; Rec. Doc. 83-5 at 4; Rec. Doc. 83-8 at 2; Rec. Doc. 83-1 at 7).

[66] *Id.* (citing *Brown v. CSC Logic Inc.*, 82 F.3d 651, 658 (5th Cir. 1996)).

[67] *Id.* at 6.

[68] *Id.* at 7.

whether LaPuma came to a correct or incorrect conclusion after his investigation is irrelevant because an employer's incorrect conclusion of employee wrongdoing is a legitimate, non-discriminatory reason for an adverse employment decision and does not establish an illegal discriminatory motivation.[69]

Turning to the FMLA retaliation and interference claims, Defendants assert that Shields has failed to show that she was denied any FMLA leave or retaliated against for taking such leave.[70] Defendants contend that Shields was not penalized for taking FMLA leave and Lisa Hukill took the fact of Shields' leave into consideration in evaluating her performance; however, Hukill did not reduce the metrics because Shields was so far behind she would have been below expectations even for an employee who worked only six months out of the year.[71] Finally, Defendants contend that Shields' racial harassment and retaliation claims should be dismissed because she has abandoned them in not addressing the racial harassment claim and failing to articulate what alleged protected activity she engaged in to establish her race retaliation claim.[72]

## D.    *Plaintiff's Arguments in Further Opposition to the Motion for Summary Judgment*

In response to Defendants' argument that Shields was not qualified for her job, Shields asserts that she need only show that she possessed the basic skills necessary to perform her job.[73] Shields asserts that she had six years of experience working in her position prior to her discharge,

---

[69] *Id.*

[70] *Id.*

[71] *Id.* at 10 (citing Rec. Doc. 83-4 at 3–4).

[72] *Id.*

[73] Rec. Doc. 85 at 1 (citing *Collins v. Cohen Pontani Lieberman & Pavane*, No. 04-cv-8983, 2008 U.S. Dist. LEXIS 54047, at *28 (S.D.N.Y. July 30, 2008)).

had received complimentary performance reviews for the last three years of her employment, and had no performance warnings aside from one in 2011.[74]

Shields reasserts her contention that the investigation by LaPuma is inadmissible and should be disregarded in its entirety because Defendants obstructed Shields' attempts to obtain legitimate discovery.[75] Shields asserts that in the absence of LaPuma's investigation, there is no support for the decision to discharge Shields based upon alleged racist comments because the decisionmakers relied upon the findings of LaPuma, Acting General Counsel.[76] Shields also contends that Dillon's statement that Shields was going to be terminated before LaPuma's investigation was complete is admissible and, even if it were not admissible, there is other evidence demonstrating that the decision to terminate Shields was made before the completion of the investigation.[77]

### III. Applicable Law

#### A.    *Legal Standard on a Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[78] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or

---

[74] *Id.* at 2.

[75] *Id.* at 3.

[76] *Id.* at 5.

[77] *Id.* at 6.

[78] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

weighing the evidence."[79] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[80] If the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law.[81] The nonmoving party may not rest upon the pleadings, but must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[82]

The party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.[83] Thereafter, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports her claims.[84] To withstand a motion for summary judgment, a plaintiff must show that there is a genuine issue for trial by presenting evidence of specific facts.[85] The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated

---

[79] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[80] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[81] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

[82] *See, e.g.*, *Celotex*, 477 U.S. at 325; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[83] *Celotex*, 477 U.S. at 323.

[84] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994).

[85] *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Anderson v. Liberty*, 477 U.S. 242, 248–49 (1996)).

assertions," or "by only a scintilla of evidence."[86] Rather, a factual dispute precludes a grant of summary judgment only if the evidence is sufficient to permit a reasonable trier of fact to find for the nonmoving party. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.[87]

## B.   McDonnell Douglas *Burden-Shifting Framework*

The burden-shifting framework established in *McDonnell Douglas Corp. v. Green* governs claims alleging discrimination under Title VII, as well as allegations of retaliation.[88] To survive summary judgment in a case under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination.[89] "To establish a prima facie case, a plaintiff need only make a very minimal showing."[90] If the plaintiff can establish a prima facie case, the burden will shift to the defendant to articulate a legitimate, nondiscriminatory purpose for an adverse employment action.[91] The defendant must point to admissible evidence in the record,[92] but the burden is one of production, not persuasion.[93] The defendant is not required to show that the employment decision was proper, only that it was not discriminatory.[94] "[E]ven an incorrect belief

---

[86] *Little*, 37 F.3d at 1075.

[87] *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987); Fed. R .Civ. P. 56(c)(2).

[88] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Munoz v. Seton Healthcare, Inc.*, 557 F. App'x 314, 321 (5th Cir. 2014)).

[89] *McDonnell Douglas Corp.*, 411 U.S. at 802; *see also Mendoza v. Helicopter*, 548 F. App'x 127, 129 (5th Cir. 2013) (applying the *McDonnell Douglas* framework to discrimination and retaliation claims).

[90] *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir. 1996) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 639 (5th Cir. 1985)).

[91] *Id.*

[92] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981).

[93] *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).

[94] *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 390 (5th Cir. 2007). *See also Perez v. Region 20*

that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for an adverse employment action.[95]

If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to show that any non-discriminatory purposes offered by the defendant are merely a pretext for discrimination.[96] Plaintiff can do this by presenting evidence of disparate treatment or demonstrating that the proffered explanation is false or "unworthy of credence."[97]

In one paragraph, Shields asserts that the *McDonnell Douglas* framework is "unworkable and should be overturned."[98] In support, Shields cites a Southern District of New York case, a Tenth Circuit case, and a concurring opinion from a Seventh Circuit case.[99] The Court is bound by the Supreme Court precedent in *McDonnell Douglas*. Accordingly, the Court follows this framework.

## IV. Analysis

### A. *Whether Defendants are Entitled to Summary Judgment on Shields' Race Discrimination Claims Because They Are Time-Barred*

Defendants assert that they are entitled to summary judgment on Shields' claims of race discrimination pursuant to Title VII and Louisiana's Employment Discrimination Law

---

*Educ. Serv. Ctr.*, 307 F.3d 318, 325 (5th Cir. 2002); *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive.").

[95] *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991).

[96] *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

[97] *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010).

[98] Rec. Doc. 74 at 17–18.

[99] *Id.* at 18 (citing *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring); *Wells v. Colo. DOT*, 325 F.3d 1205, 1221 (10th Cir. 2003); *Lapsley v. Columbia Univ.-Coll. Of Physicians & Surgeons*, 999 F. Supp. 506, 513–14 (S.D.N.Y. 1998)).

("LEDL").[100] Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race . . . ."[101] A plaintiff may establish a violation of Title VII by proving that discrimination has created a hostile or abusive working environment,[102] or by proving disparate treatment on the basis of race.[103] Louisiana's Employment Discrimination Law, Louisiana Revised Statute § 23:301 *et seq.*, is "substantively similar" to Title VII, and Louisiana courts routinely look to federal jurisprudence for guidance in interpreting Louisiana discrimination laws.[104] Because the Louisiana Supreme Court has addressed state-law discrimination claims in light of federal Title VII case law,[105] and because the Court is not aware of any statutory or Louisiana Supreme Court authority suggesting that the Louisiana Supreme Court would follow a different approach in this case, this Court's Title VII analysis, below, applies to Shields' employment discrimination claims under the LEDL as well.

Defendants first assert that any federal race discrimination claims arising out of alleged acts prior to May 8, 2014, or 300 days prior to the filing of Shields' charge of discrimination, are time-barred pursuant to Title VII.[106] Defendants also contend that any race discrimination claims

---

[100] Rec. Doc. 63-1 at 18.

[101] 42 U.S.C. § 2000e–2(a)(1).

[102] *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986).

[103] *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001).

[104] *McCoy v. City of Shreveport*, 492 F.3d 551, 556 n.4 (5th Cir. 2007) (citing *Trahan v. Rally's Hamburgers, Inc.*, 96-1837 (La. App. 1 Cir. 6/20/97); 696 So. 2d 637, 641).

[105] *King v. Phelps Dunbar, L.L.P.*, 98-1805 (La. 6/4/99); 743 So. 2d 181, 187 ("Louisiana courts have looked to federal jurisprudence to interpret Louisiana discrimination laws.").

[106] Rec. Doc. 63-1 at 18.

pursuant to the Louisiana Employment Discrimination Law ("LEDL") based upon allegations prior to February 3, 2014 are prescribed.[107] Shields does not respond to these arguments.

Pursuant to 42 U.S.C. § 2000e-5(e)(1), a Title VII plaintiff must file a charge with the Equal Employment Opportunity Commission (EEOC) within 300 days "after the alleged unlawful employment practice occurred."[108] The Supreme Court has held that the statute precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period.[109] Shields filed her EEOC charge on March 4, 2015.[110] Accordingly, to the extent that Plaintiff claims race discrimination pursuant to Title VII based upon any discrete acts of discrimination that occurred prior to May 8, 2014, her claim(s) are time-barred.

Louisiana Revised Statute § 23:303(D) provides that a cause of action pursuant to the Louisiana Employment Discrimination Law:

> shall be subject to a prescriptive period of one year. However, this one-year period shall be suspended during the pendency of any administrative review or investigation of the claim conducted by the federal Equal Employment Opportunity Commission or the Louisiana Commission on Human Rights. No suspension authorized pursuant to this Subsection of this one-year prescriptive period shall last longer than six months.

Therefore, the maximum prescriptive period is eighteen months. The Supreme Court of Louisiana has held that the prescriptive period in such an action "commences the day the injury or damage

---

[107] *Id.* at 19.

[108] 42 U.S.C. § 2000e-5(e)(1); *Hartz v. Adm'rs of Tulane Educ. Fund*, 275 F. App'x 281, 287 (5th Cir. 2008).

[109] *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

[110] Rec. Doc. 63-5 at 12.

is sustained."[111] Shields filed her complaint on August 4, 2015.[112] Accordingly to the extent that Shields' race discrimination claims pursuant to the LEDL are based upon allegations of discrimination that occurred prior to February 3, 2014, those claims are prescribed.

**B.** **Whether Defendants are Entitled to Summary Judgment on Shields' Claim That She Was Terminated As Retaliation for Exercising Rights Pursuant to Title VII**

To establish a prima facie case of retaliation under the traditional *McDonnell Douglas* framework, "the plaintiff must establish that: (1) [she] participated in an activity protected by Title VII; (2) [her] employer took an adverse employment action against [her]; and (3) a causal connection exists between the protected activity and the adverse employment action."[113] An employee engages in activity protected by Title VII when the employee has "opposed any practice made an unlawful employment practice" by Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII.[114]

Shields does not make any attempt to differentiate her race discrimination claim from her retaliation claim pursuant to Title VII, nor does Shields articulate how she has stated a prima facie case of retaliation. However, Shields presents evidence through her deposition that she complained in 2009 about the lack of diversity and the "racial discrimination she was feeling."[115] Although Shields brings this claim asserting that she was ultimately terminated, Shields makes no connection

---

[111] *Eastin v. Entergy Corp.*, 2003-1030 (La. 2/6/04); 865 So. 2d 49, 53 (citing La. Civ. Code art. 3492).

[112] Rec. Doc. 1.

[113] *McCoy,* 492 F.3d at 557 (5th Cir. 2007) (citing *Banks v. E. Baton Rouge Par. Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003); *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002)); *see also Ion v. Chevron USA, Inc.*, 731 F.3d 379, 390 (5th Cir. 2013) (applying the same test in the FMLA context).

[114] 42 U.S.C. § 2000e-3(a); *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996).

[115] Rec. Doc. 74-5 at 9–10.

between any complaint she made in 2009 and her termination five years later in 2014. Shields makes no assertion that she suffered any adverse employment action as a result of her 2009 complaints and, in fact, states that she never heard back from anyone in Human Resources regarding her complaints and specifically states that "[n]othing was done" with regard to any complaints.[116] Because Shields has not identified any adverse employment action taken against her as a result of any activity protected pursuant to Title VII, Shields has failed to establish a prima facie case of retaliation pursuant to Title VII. Accordingly, Defendants are entitled to summary judgment on this retaliation claim. To the extent that Shields brings a race retaliation claim pursuant to the LEDL, Defendants are entitled to summary judgment on this claim as well.[117]

## C.   *Whether Defendants Are Entitled to Summary Judgment on Shields' Hostile Work Environment Claim*

Defendants also move for summary judgment on Shields' "harassment and racially hostile work environment claim."[118] In her complaint, Shields asserts that she brings a "Race Discrimination/Harassment" claim against Defendants pursuant to Title VII and Louisiana's Employment Discrimination Law.[119] However, in her opposition to the motion for summary judgment, Shields states that she is not bringing a separate and distinct claim for harassment relating to Dillon's alleged mistreatment, but rather those allegations are part of her discrimination

---

[116] *Id.* at 10, 15.

[117] The Fifth Circuit has explained that "[r]etaliation based on race does not fall within the scope of Louisiana Employment Discrimination Law." *Corley v. Louisiana ex rel. Div. of Admin., Office of Risk Mgmt.*, 498 F. App'x 448, 451 (5th Cir. 2012) (per curiam).

[118] Rec. Doc. 63-1 at 26.

[119] Rec. Doc. 1 at 6.

and retaliation disparate treatment claims.[120] Accordingly, the Court grants the motion for summary judgment regarding any hostile work environment claim Shields may have had.

### D.    Whether Defendants Are Entitled to Summary Judgment on Shields' FMLA Interference Claim

The FMLA prohibits employers from "interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the Act" and retaliating against employees who exercise FMLA rights.[121] To establish a prima facie FMLA interference case, a plaintiff must show that: (1) she was an eligible employee; (2) the defendant was an employer subject to the FMLA's requirements; (3) she was entitled to leave; (4) she gave proper notice of her intention to take FMLA leave; and (5) the defendant denied her the benefits to which she was entitled under the FMLA.[122] Furthermore, employees bear the burden of proving a real impairment of their FMLA rights and resulting prejudice.[123] Moreover, "FMLA's remedial scheme requires an employee to prove prejudice as a result of the employer's lapse; the employee may not expand the statute's coverage as a penalty for an employer's technical compliance shortcoming."[124] Even where a reasonable jury could find that an employer interfered, restrained or denied the exercise of FMLA rights, an employee must still point to evidence that she lost compensation or benefits by reason

---

[120] Rec. Doc. 74 at 2.

[121] 29 C.F.R. § 825.220.

[122] *See Lanier v. Univ. of Texas Sw. Med. Ctr.*, 527 F. App'x 312, 316 (5th Cir. 2013).

[123] *Jones v. Children's Hosp.*, 58 F. Supp. 3d 656, 668 (E.D. La. 2014) (Morgan, J.) (citing *Lubke v. City of Arlington*, 455 F.3d 489, 497 (5th Cir. 2006)).

[124] *Lubke*, 455 F.3d at 497.

21

of the violation, sustained other monetary losses as a direct result of the violation, or suffered some loss in employment status such that equitable relief is appropriate.[125]

Shields contends that she has established a prima facie case of FMLA interference and FMLA retaliation.[126] However, Shields does not distinguish between her claim for FMLA interference and her claim for FMLA retaliation. Shields makes no argument that she was denied any FMLA leave or that she was discouraged from taking any FMLA leave. Shields does not identify any lost compensation or benefits by reason of any violation, any monetary losses as a direct result of the violation, or loss in employment status. Therefore, Shields' argument appears to be not that she was denied any FMLA benefits or prevented from using any FMLA benefits, but rather that she was retaliated against for using her benefits. Accordingly, as Shields has not identified any interference, restraint or denial of her FMLA rights, the Court grants summary judgment on Shields' interference claim.

### E.   *Whether Defendants Are Entitled to Summary Judgment on Shields' Claims of Race Discrimination and FMLA Retaliation*

#### 1.   **Whether Shields Has Established a Prima Facie Case of FMLA Retaliation and Race Discrimination**

##### a.   *FMLA Retaliation*

To establish a prima facie case of retaliation under the traditional *McDonnell Douglas* framework, "the plaintiff must establish that: (1) [she] participated in an activity protected by [the FMLA]; (2) [her] employer took an adverse employment action against [her]; and (3) a causal

---

[125] *Jones*, 58 F. Supp. 3d at 668–69 (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 90 (2002); 29 U.S.C. § 2617(a)(1)).

[126] Rec. Doc. 74 at 15.

connection exists between the protected activity and the adverse employment action."[127] Shields does not articulate how she has established the elements of a prima facie case of retaliation; rather, she asserts that there is "at least a fact question as to whether Plaintiff was treated less favorably (and even terminated) for exercising her right to FMLA-protected leave."[128] Nevertheless, Shields has submitted evidence that she: (1) took FMLA leave;[129] (2) was terminated;[130] and (3) that her supervisor, Dillon, and Associate Vice President of Development, Lisa Hukill, spoke negatively about Shields' performance during the time that she was taking FMLA leave, referred to her FMLA leave as an "excuse," and that Defendants later terminated Shields, listing "inadequate performance" as one of the reasons.[131] Accordingly, the Court concludes that Shields has established a prima facie case of FMLA retaliation.

### b.    Race Discrimination

Shields also alleges that she was subject to disparate treatment on the basis of her race.[132] Courts analyze such discrimination claims under the *McDonnell Douglas* framework.[133] Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case by showing that she:

---

[127] *McCoy v. City of Shreveport,* 492 F.3d 551, 557 (5th Cir. 2007) (citing *Banks v. E. Baton Rouge Par. Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003); *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002)); *see also Ion v. Chevron USA, Inc.*, 731 F.3d 379, 390 (5th Cir. 2013) (applying the same test in the FMLA context).

[128] Rec. Doc. 74 at 17.

[129] Rec. Doc. 74-9 at 27.

[130] *Id.* at 23.

[131] Rec. Doc. 72- at 11–12; Rec. Doc. 74-9 at 23, 27.

[132] Rec. Doc. 1 at 6.

[133] *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007) (citing *McDonnell Douglas*, 411 U.S. at 802).

23

> (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group.[134]

Within the Fifth Circuit, not all negative workplace events constitute "adverse employment actions" cognizable under Title VII. Rather, "adverse employment actions" consist of "ultimate employment decisions such as hiring, firing, demoting, promoting, granting leave, and compensating."[135]

Here, Defendants concede that Shields meets the first and third prongs of the prima facie case because she is Caucasian and her employment was terminated.[136] Defendants argue, however, that Shields cannot meet the second prong of the case because she was not qualified for the position, or the fourth prong, because her position remained open for four to five months before an African-American man was hired.[137] Defendants argue that Shields was not qualified for her position because she refused to comply with the performance metrics and had a history of poor performance.[138] The Fifth Circuit has held that in order for a plaintiff to show that she is qualified for a position, she must demonstrate only that she continued to possess the necessary qualifications for her job at the time of the adverse action.[139] The Fifth Circuit in *Bienkowski v. American Airlines* explained "[b]y this we mean that plaintiff had not suffered physical disability or loss of a

---

[134] *Id.* (citing *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005)).

[135] *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014).

[136] Rec. Doc. 63-1 at 21.

[137] *Id.*

[138] *Id.*

[139] *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1505–06 (5th Cir. 1988).

necessary professional license or some other occurrence that rendered [her] unfit for the position for which [s]he was hired."[140] Shields has submitted evidence of her performance evaluations over the six years that she worked for Defendants, including from 2014, where it was indicated that she had met her overall goal and job performance expectations.[141] Defendants do not argue that Shields suffered some kind of change that rendered her unfit for the position; rather, they assert only that they were no longer satisfied with her work. Accordingly, Shields has presented evidence that she was "qualified" for her position.

Defendants also argue that Shields cannot establish a prima facie case of discrimination because she was replaced by an African-American employee months after she was terminated.[142] In Dillon's deposition, he testified that an African-American man was hired to replace Shields.[143] Defendants cite no case law to support their argument that a couple-month period between the termination of the plaintiff and the replacement being hired undermines the existence of a prima facie case. Defendants also argue that the fact that the majority of the Directors of Development are Caucasian and that the members of management who terminated Shields are also Caucasian undermines the existence of a prima facie case of discrimination.[144] Defendants do not cite any authority to support this proposition. Moreover, Shields appears to dispute that the majority of the Directors of Development were Caucasian at the time of her termination[145] and there is no evidence

---

[140] *Id.* at 1056 n.3.

[141] Rec. Doc. 74-3 at 15.

[142] Rec. Doc. 63-1 at 21–22.

[143] Rec. Doc. 74-2 at 10.

[144] Rec. Doc. 63-1 at 21–22.

[145] Rec. Doc. 74 at 4.

in the record regarding the race of management team that terminated Shields. Accordingly, as it is undisputed that Shields is a member of a protected group and was terminated from her employment, and because she has presented evidence that she was qualified for her position and was replaced by someone outside of her protected group, the Court concludes that Shields has established a prima facie case of race discrimination.

### 2. Whether Defendants Have Proffered Nondiscriminatory and Nonretaliatory Reasons for Shields' Termination

As Shields has established a prima facie case for race discrimination and FMLA retaliation, the burden shifts back to Defendants to put forth a legitimate, nondiscriminatory and nonretaliatory reason for Shields' termination.[146] Defendants assert in their motion that there are three legitimate, nondiscriminatory and nonretaliatory reasons for Shields' termination: (1) Shields made "racially insensitive remarks to Keli Nees"; (2) Shields had "long-term poor performance"; and (3) there was a "lack of support of the Executive Director."[147] Defendants have presented Shields' termination letter, in which Defendants state that Shields is being terminated for "workplace misconduct, lack of support of the Executive Director, inadequate performance, including a lack of cultural competency."[148] Plaintiff, in her opposition to Defendants' motion for summary judgment, asserts that "Defendants have confirmed that the alleged 'workplace misconduct' and 'lack of cultural competency' refer to the allegations made by Ms. Nees and the investigation (or lack thereof) purportedly conducted by Mr. LaPuma."[149] The three reasons articulated by

---

[146] *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

[147] Rec. Doc. 63-1 at 22.

[148] Rec. Doc. 63-5 at 11.

[149] Rec. Doc. 74 at 4.

Defendants in their motion for Shields' termination do not align perfectly with the reasons articulated in Shields' termination letter. However, because Defendants assert that they are entitled to summary judgment based upon the reasons listed in the motion, and because Shields structures her opposition based upon these proffered reasons, the Court will address only Defendants' reasons for termination as articulated in Defendants' motion.

### 3. Whether Shields Has Met Her Burden of Demonstrating that Defendants' Proffered Reasons are Pretext for Race Discrimination and FMLA Retaliation

As Defendants have met their burden of production of putting forth nondiscriminatory and nonretaliatory reasons for Shields' termination, the burden shifts back to Shields to show that the reasons offered by Defendants are merely a pretext for race discrimination and FMLA retaliation.[150] Shields may prove pretext either through evidence of disparate treatment or by showing that Defendants' proffered explanation is false or "unworthy of credence."[151] The Court will address each of Defendants' proffered reasons in turn.

#### a. Racially Insensitive Remarks

Defendants first assert that Shields was terminated for making racially insensitive remarks to another employee of Defendants, Keli Nees ("Nees").[152] In determining whether an employer engaged in discrimination in using allegations of misconduct lodged by another employee, "[t]he real issue is whether the employer reasonably believed the employee's allegation and acted on it in good faith, or to the contrary, the employer did not actually believe the co-employee's allegation

---

[150] *Leal v. BFT, Ltd. P'ship*, 423 F. App'x 476, 480 (5th Cir. 2011).

[151] *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

[152] Rec. Doc. 63-1 at 22.

but instead used it as a pretext for an otherwise discriminatory dismissal."[153] Even an incorrect belief that Shields made these discriminatory comments is a legitimate reason.[154]

In this case, however, Defendants do not contend that they relied on Nees' statements. In fact, Defendants assert that "all decision makers testified that they made the decision to terminate Plaintiff because they relied on the findings by acting General Counsel Victor LaPuma that Plaintiff made racially insensitive remarks to Keli Nees, which were in stark contrast to Boys Town's Mission to help troubled children of all ethnicities and religions and a violation of its zero tolerance discrimination policy."[155] Executive Vice President Dan Daly ("Daly") testified regarding the investigation, stating:

> The reason we conduct an investigation is to ascertain the likelihood or lack of likelihood certain events occurred. And I don't know that we can ever get the kind of corroboration that a trial judge would want to have. But on some we believe that Ms. Shields had been at minimum extremely indiscreet in her conversations with Ms. Nees. And I'm talking about extremely racially indiscreet. That's why we took the action we took.[156]

When Daly was asked if Defendants had reached that conclusion because of LaPuma's investigation, he responded, "Yeah, I have to rely upon the investigator. I don't conduct the investigation personally."[157]

However, Shields has presented evidence that Defendants actually had made the decision to terminate Shields prior to the conclusion of the investigation. In her deposition, Shields testified

---

[153] *Waggonner v. City of Garland, Tex.*, 987 F.2d 1160, 1165 (5th Cir. 1993).

[154] *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 390 (5th Cir. 2007).

[155] *Id.* at 32.

[156] Rec. Doc. 63-3 at 53.

[157] *Id.*

that on October 30, 2014, she heard Dillon state that Defendants "had already picked the date out for the termination."[158] Furthermore, Shields presents the notes of Traci McAuliffe from October 31, 2014 in which McAuliffe refers to termination.[159] Shields was suspended on October 31, 2014 and terminated on November 7, 2014.[160] Therefore, Shields has raised a genuine issue of material fact regarding whether Defendants decided to terminate Shields prior to conducting an investigation into whether the allegations lodged by Nees were true and, therefore, has raised a genuine issue of material fact regarding whether Defendants' proffered reason, racially insensitive comments, is false or unworthy of credence.

### b.    Poor Performance

Defendants also assert that Shields was terminated for her long-term poor performance.[161] Defendants have presented the testimony of: (1) Shann McKeever, one of the supervisors of the executive directors, who testified that Shields was an underperformer;[162] (2) Dillon, the Executor Director, who testified that Shields' work was "almost always substandard when we looked at the metrics;"[163] (3) Dan Daly, another supervisor of the executive directors, who testified that he told Dillon to give Shields performance warnings and to put her on a performance improvement plan in 2014;[164] (4) Traci McAuliffe, who testified that in 2014, a performance improvement plan for

---

[158] Rec. Doc. 74-5 at 13.

[159] Rec. Doc. 74-9 at 24–25.

[160] Rec. Doc. 63-5 at 11; Rec. Doc. 74-9 at 22.

[161] Rec. Doc. 63-1 at 22.

[162] Rec. Doc. 63-2 at 2.

[163] *Id.* at 104.

[164] Rec. Doc. 63-3 at 51.

Shields was actually drafted along with a written warning, although neither were sent to Shields;[165] and (5) Lisa Hukill, who testified that she had more than ten meetings with Shields regarding her performance metrics, and testified that if she had been Shields' supervisor, she would have terminated her for her performance.[166]

Shields contends that Dillon's testimony, Shields' performance on her evaluations, and the performance metrics that Defendants rely upon all establish that her discharge had nothing to do with her performance.[167] Shields submits the deposition of Dillon, in which he stated that if performance was the issue, there probably would have been a 30-day performance improvement plan, after which Shields was evaluated before a decision was made to terminate.[168] Shields also cites Dillon's testimony in which he stated it would have been premature to say that Shields would have been terminated due to performance.[169] Shields also asserts that her performance evaluations directly contradict Defendants' contentions that her performance was poor and warranted termination.[170] Shields contends that she received the second-highest possible score on her performance evaluations in 2009 and 2010, she received her only performance warning in 2011, her 2012 performance evaluation states that she had made "some significant strides toward moving the Site's development efforts in a positive direction," she received the second-highest possible score in her 2013 evaluation, and she received a "met expectations" score in her 2014

---

[165] Rec. Doc. 83-7 at 6–7.

[166] Rec. Doc. 83-4.

[167] Rec. Doc. 74 at 8.

[168] Rec. Doc. 74-2 at 14.

[169] Rec. Doc. 74 at 8 (citing Rec. Doc. 74-2 at 7).

[170] *Id.*

evaluation.[171] Furthermore, Shields contends that she outperformed at least half of the other Directors of Development at a time in which she was out of work on FMLA-protected leave for more than 37 days of the nine-month period.[172] She also asserts that the absence of any performance metrics of Shields from the month of October 2014 also demonstrates the falsity of Defendants' proffered justification.[173]

In this case, although Defendants submit testimony from numerous witnesses testifying to Shields' poor performance over the years, Shields has submitted testimony from Dillon stating that it would be premature to terminate Shields due to poor performance.[174] In addition, although the 2014 performance evaluation reflects that Defendants believed that Shields had not met expectations in several areas, Shields' overall performance evaluation score reflects that she had met expectations.[175] Accordingly, Shields has raised a genuine issue of material fact regarding whether Defendants' proffered reason of "long-term poor performance" for Shields' termination was false and unworthy of credence and therefore pretext for race discrimination and/or FMLA retaliation.

---

[171] *Id.* at 8–9.

[172] *Id.* at 9.

[173] *Id.*

[174] Rec. Doc. 74-2 at 7.

[175] Rec. Doc. 74-3 at 14.

### c.      *Lack of Support of Executive Director Dillon*

Defendants also assert that Shields was terminated for "the lack of support of the Executive Director."[176] In the written summary Nees submitted to Defendants regarding Shields' racially insensitive comments, Nees asserted that "Lynn spoke terribly about Dr. Dillon. She stated that he is nothing but a drunk and wants nothing more than to fill the board with his drunk, black friends and none of them contribute to the organization."[177] Defendants submit the testimony of Executive Vice President Dan Daly who, when asked if he knew if any of the statements Shields allegedly made to Nees regarding Executive Director Dillon were true, stated that although he didn't personally know whether the allegations were true, Nees was a relatively new employee who would only know certain information that she was reporting if Shields has told her.[178] Daly asserted that his reaction to hearing that Shields allegedly made these statements was "we have to investigate this. And if this happened, it's grounds for termination. And if it didn't happen, we move on."[179] Therefore, it appears the facts giving rise to allegedly terminating Shields for making racially insensitive comments occurred at the same time as the facts giving rise to Shields allegedly being terminated for lack of support of the Executive Director, and all of the facts were being investigated through the same investigative process.

As discussed above, Shields has presented evidence that a decision to terminate Shields was made prior to the conclusion of the investigation. Accordingly, because Defendants assert that

---

[176] Rec. Doc. 63-1 at 22.

[177] Rec. Doc. 74-6 at 35.

[178] Rec. Doc. 63-3 at 54–55.

[179] *Id.* at 55.

they relied upon the investigation in making the decision to terminate Shields and Shields has presented evidence that the decision to terminate Shields was in fact made prior to conducting an investigation into whether the allegations lodged by Nees were true, Shields has raised a genuine issue of material fact regarding whether Defendants' proffered reason, lack of support of Executive Director Dillon, was false or unworthy of credence and was therefore pretext for race discrimination and/or FMLA retaliation.

***d.***     ***Conclusion***

In order to carry her burden at the pretext stage, Shields must rebut "each nondiscriminatory or nonretaliatory reason articulated by [Defendants]."[180] Shields has presented evidence raising a genuine issue of material fact regarding each of Defendants' proffered reasons for termination. Therefore, the Court concludes that summary judgment is inappropriate on Shields' race discrimination and FMLA retaliation claims.

**IV. Conclusion**

The Court concludes that Shields has raised a genuine issue of material fact regarding whether Defendants' proffered reasons for her termination were pretext for race discrimination and/or FMLA retaliation. However, Shields has not identified any interference, restraint or denial of her FMLA rights to establish a claim for FMLA interference. Nor has Shields established a prima facie case of retaliation pursuant to Title VII or any state law race retaliation claim. Finally, Shields has abandoned any hostile work environment claim that she may have had.

Accordingly,

---

[180] *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2001).

**IT IS HEREBY ORDERED** that Defendants' "Motion for Summary Judgment"[181] is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that the motion for summary judgment is **GRANTED** on Shields' claims of FMLA interference, retaliation pursuant to Title VII, any state law race retaliation claim, and any hostile work environment claim.

**IT IS FURTHER ORDERED** that the motion for summary judgment is **DENIED** on Shields' claims of race discrimination and FMLA retaliation.

**NEW ORLEANS, LOUISIANA**, this 12th day of July, 2016.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[181] Rec. Doc. 63.